Exhibit C

Shane A. Brunner (Admitted Pro Hac Vice)
sbrunner@michaelbest.com
MICHAEL BEST & FRIEDRICH LLP
One South Pinckney Street, Suite 700
Madison, WI 53703
Telephone: (608) 257-3501

Byron E. Ma (SBN 299706) (Local Counsel)
bma@buchelaw.com
John K. Buche (SBN 239477) (Local Counsel)
jbuche@buchelaw.com
BUCHE & ASSOCIATES, P.C.
875 Prospect St., Suite 305
La Jolla, CA 92037
Telephone: (858) 459-9111

*Attorneys for Plaintiff*
*mate, LLC*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| mate, LLC, an Oklahoma Limited Liability company, | Case No.: 3:22-cv-01095-CAB-DEB |
| Plaintiff, | SUMMARY OF EXPERT OPINIONS OF BRUCE A. YOUNG IN SUPPORT OF PLAINTIFF MATE, LLC'S PROPOSED CLAIM CONSTRUCTIONS |
| v. | |
| Advanced Lighting Concepts, LLC d/b/a Environmental Lights, a California limited liability company, | |
| Defendant. | |

## I.      INTRODUCTION

1.      I have been retained on behalf of Plaintiff mate, LLC ("Plaintiff" or "mate") to offer my expert opinions concerning certain claim terms from the mate patents which were identified by Plaintiff and/or Defendant Advanced Lighting Concepts, LLC d/b/a Environmental Lights ("Defendant" or "EL") as requiring construction. I summarize these opinions herein.

2.      I understand that the mate patents that contain claim terms for construction include U.S. Patent No. 8,525,446 ("the '446 patent"), U.S. Patent No. 8,957,601 ("the '601 patent"), U.S. Patent No. 9,049,759 ("the '759 patent"), U.S. Patent No. 9,078,310 ("the '310 patent"), U.S. Patent No. 9,320,093 ("the '093 patent"), and U.S. Patent No. 9,591,713 ("the '713 patent") (collectively the "mate patents"). The specific claim terms I address in this declaration are set forth below.

3.      I have no financial interest in mate, LLC. I am being compensated at my standard consulting rate of $270 per hour plus expenses. No part of my compensation depends on the outcome of this litigation.

## II.     SUMMARY OF BACKGROUND AND QUALIFICATIONS

4.      I am currently a Registered Patent Agent. I earned a Master of Science in Electrical Engineering from Stanford University and a Bachelor of Science in Computer Engineering from Iowa State University. Prior to my work as a Registered Patent Agent, I worked for approximately 30 years in numerous engineering and technology leadership roles for companies including Jabil Circuit, Inc. (Director of System Architecture for Display Technology), Radiosophy, LLC (Chief Technology Officer), Digital 5, Inc. (Chief Technology Officer), Gateway, Inc. (Director, Sr. Manager, Chief Engineer), Intel Corporation (Sr. Staff Engineer, Staff Engineer), Aptec Computer Systems (Senior Design Engineer), Pixar Animation Studios (Consultant, Project Manager, Sr. Design Engineer), and Hewlett-Packard (Member of Technical Staff, Co-Op Student). I am also a named inventor on over 50 U.S. patents. My current curriculum vitae (CV) is attached hereto as Appendix A.

### III.   MATERIALS CONSIDERED

5.     In preparing this summary of my claim construction opinions, I have considered my own knowledge and experience, including my professional experience in the above fields, and my experience working with others involved in those fields. Further, I reviewed the parties' proposed claim constructions, the mate patents and their prosecution histories, and the extrinsic evidence identified by the parties. I refer to the mate patents and the prosecution histories as "intrinsic evidence" and other evidence such as dictionary definitions and other external sources as "extrinsic evidence."

### IV.   TECHNOLOGY OVERVIEW

6.     The mate patents are directed to power supply drivers and dimmers for light emitting diode ("LED") lighting. LED lighting is more efficient than traditional incandescent lighting, provides superior light quality, and LED bulbs last about 50 times longer than incandescent bulbs. These features and others make LED lighting superior and less expensive than incandescent lighting.

7.     At the time of the mate patents, LED lighting was in use but did not have widespread adoption. One reason for this is the existing power infrastructure and the limitations of LED lighting. In particular, the existing power infrastructure (e.g., the power delivered to homes and businesses) supplies alternating current ("AC") power. The main reason for this is that AC power can be distributed over long distances with transformers, but direct current ("DC") power cannot. LED lights do not operate on AC power but instead require low-voltage DC power.

8.     Because of the AC power delivered to homes and businesses, most LED lighting applications relied on retrofitting existing lighting fixtures built for incandescent lighting. In operation, AC power would be provided to the LED light fixture, or even directly to the LED light bulb, which then converted the AC power to the low-voltage DC power required by the LEDs. Conversion from AC to DC at the lighting fixture or bulb was expensive, inefficient and not practical for large scale implementation.

9.      The inventors of the mate patents developed an architecture where LED lights were provided low-voltage DC power from power supplies located remotely from the light fixtures. This had the benefits of reducing costs, increasing functionality and making large scale implementation more practical than could be provided by retrofitting LED fixtures or bulbs. In general, the architecture included a power circuit to convert the AC power to a voltage regulated DC output that could be provided to multiple output drivers that used current regulation, instead of the more common voltage regulation, to control the output power to the LEDs. Because LEDs are current-based devices, using current regulation provides many advantages over voltage regulation such as more consistent brightness control and the lack of need for a current-regulating resistor found in LED fixtures, which eliminated the power lost as heat in the resistor. The inventions also provided features to control the output current drivers so that light fixtures can be individually (or in groups) controlled and dimmed. The enhanced lighting control also allows for human centric lighting which refers to lighting that benefits human health by mimicking the color and intensity of natural light as it changes throughout the day.

10.      The patented architecture also addressed several obstacles. For example, it needed to ensure that its larger power circuits were safe and did not cause problems for the building's electrical infrastructure. To address this, the inventors included features such as power limit, inrush current limit, and PFC boost circuits.

## V.      SUMMARY OF CLAIM CONSTRUCTION OPINIONS

11.      I understand that the parties have identified certain claim terms for construction. I reserve the right to opine on other terms should the need arise.

12.      Based on my review of the parties' proposed constructions, intrinsic and extrinsic evidence, I summarize below my opinions of how a person of ordinary skill in the art ("POSA") would understand the disputed claim terms, which I will more fully address in conjunction with mate's claim construction briefing.

**A.     Power limit**

13.     I have reviewed both parties' proposed constructions of "power limit" and related evidence. Based on the intrinsic and extrinsic evidence, I agree with mate's proposed construction of "power limit" as having its plain an ordinary meaning, "a circuit that limits power," or in other words, "a circuit that prevents the power delivered from exceeding a value."

14.     The claims of the '446 patent describe the "power limit" as a component of the "power circuit" and being "connected to the output voltage bus." ('446 patent at claim 1.) The '446 patent states that the "inrush circuit 40, the PFC boost 44, the DC/DC converter 46, the Output Voltage Base bus 48 and the power limit 50 can be seen as a power circuit 47." ('446 patent at 4:12-14.) The '601 patent claims describe the "power circuit having at least one power limit" and a "set of output current drivers connected to the at least one power limit." ('601 patent at claim 1.) Figures 3 and 8 show "power limit 50" as part of and within the "power circuit 47." ('446 patent at FIGS. 3, 8.) The specifications of the mate patents refer to the "power limit" as a "power limit 50," "power limiter 50," and "power limit circuit 50." (*See, e.g.*, '446 patent at 4:10-16, 5:61-6:4.) The mate patents further explain that the "power limit" "limit[s] the power output of each of the output current drivers" and "limit[s] the energy to the loads." ('446 patent at 5:51-6:2.) The '601 patent states that "each power limit is connected to a set of output current drivers 52 to limit the power output supplied to the set of output current drivers" and "[t]he power limit circuit 50 limits the amount of power supplied to a set of output current drivers under normal operation of each." ('601 patent at 10:62-64, 11:4-6.)

15.     Based on the intrinsic evidence, a POSA would understand the "power limit" in the asserted claims of the mate patents is a power limit circuit and would apply that plain and ordinary meaning. To the extent, the plain and ordinary meaning of "power limit" requires further explanation, it is "a circuit that prevents the power delivered from exceeding a value." (*See, e.g.*, '446 patent at 4:3-22, 4:44-49, 5:61-6:4, 9:49-57, FIGS. 3,

8, claim 1.) The extrinsic evidence is consistent with and supportive of mate's construction.

16.     EL's proposed construction of "power limit" as "a setting that equals the maximum amount of power produced by a device" is incorrect. There is nothing in the mate patents describing the "power limit" being a setting. Also, because claims describe the "power limit" as a component of the "power circuit" and as being "connected to" other components in the circuit, such as "the output voltage bus," a POSA would understand "power limit" to be a circuit that limits power and not a setting.

17.     Further, I understand that EL asserts that "power limit" is indefinite. I disagree. As discussed above, it is my opinion that a POSA would understand the claimed "power limit." Indeed, the claim term "power limit," read in light of the intrinsic evidence and extrinsic evidence, does not fail to inform a POSA, with reasonable certainty, about the scope of the claimed invention and is not indefinite.

### B.     Inrush current limit

18.     I have reviewed both parties' proposed constructions of "inrush current limit" and related evidence. Based on the intrinsic and extrinsic evidence, I agree with mate's proposed construction of "inrush current limit." A POSA would understand "inrush current limit" to have its plain an ordinary meaning, which is an "inrush current limit circuit," or in other words, "a circuit that prevents the current that a device draws when first energized from exceeding a value."

19.     An inrush current is the current produced during the initial startup of the power source. (*See, e.g.*, '446 patent at 4:63-64, IEEE Dictionary ("IEEE") (definition of "inrush" and "inrush current"), Modern Dictionary of Electronics ("MDE") (definition of "inrush" and "inrush current").)

20.     The claims of the '446 and '759 patents describe the "inrush current limit" as a component of the "power circuit" and being "connected to" the "power factor correction (PFC) boost." ('446 patent at claim 1; '759 patent at claims 1, 20.) The '446 patent states that the "inrush circuit 40, the PFC boost 44, the DC/DC converter 46, the

5

Output Voltage Base bus 48 and the power limit 50 can be seen as a power circuit 47." ('446 patent at 4:12-14.) Figures 3 and 8 show "inrush current limit 40." ('446 patent at FIGS. 3, 8.) The specifications of the mate patents refer to the "inrush current limit" as a "inrush current limit 40," "inrush current limit circuit 40," "current limit 40," "inrush circuit 40," and "limiter 40." (*See, e.g.*, '446 patent at 2:53-55, 4:3-22, 4:40-49, 4:62-5:5, 5:12-29, 6:14-19.) The mate patents explain that the "inrush current limit" can "reduce power consumption and improve efficiency." (*See, e.g.*, '446 patent at 2:53-55.)

21.   Based on the intrinsic evidence, a POSA would understand the "inrush current limit" in the asserted claims of the mate patents is in an inrush current limit circuit and apply that plain and ordinary meaning. To the extent, the plain and ordinary meaning of "inrush current limit" requires further explanation, it is "a circuit that prevents the current that a device draws when first energized from exceeding a value." (*See, e.g.*, '446 patent at 2:53-55, 4:3-22, 4:40-49, 4:62-5:5, 5:12-29, 6:14-19, FIGS. 3, 8, claim 1.) The extrinsic evidence, including the documentation from Moons,' the manufacturer of the accused products, is consistent with and supportive of mate's construction.

22.   EL's proposed construction of "inrush current limit" as "a setting that is the maximum amount of an initial flow of electric charge that occurs when a device is first turned on" is incorrect. There is nothing in the mate patents describing an inrush current limit as being a setting. Also, because claims describe the "inrush current limit" as a component of the "power circuit" and as "connected to" the "power factor correction (PFC) boost," a POSA would understand "inrush current limit" to be a circuit that limits inrush current and not a setting.

23.   Further, I understand that EL asserts that "inrush current limit" is indefinite. I disagree. As discussed above, it is my opinion that a POSA would understand the plain and ordinary meaning of "inrush current limit." Thus, the claim term "inrush current limit," read in light of the intrinsic evidence, does not fail to inform a POSA, with reasonable certainty, about the scope of the claimed invention and is not indefinite.

## C.    Power factor correction (PFC) boost

24.    I have reviewed both parties' proposed constructions of "power factor correction (PFC) boost" and related evidence. Based on the intrinsic and extrinsic evidence, I agree with mate's proposed construction of "power factor correction boost" as having its plain and ordinary meaning, which is "a circuit that increases the power factor."

25.    The claims of the '446 and '759 patents describe the "power factor correction (PFC) boost" as a component of the "power circuit" and being "connected to the inrush current limit and the DC/DC converter." ('446 patent at claim 1; '759 patent at claims 1, 20.) The '446 patent states that the "inrush circuit 40, the PFC boost 44, the DC/DC converter 46, the Output Voltage Base bus 48 and the power limit 50 can be seen as a power circuit 47." ('446 patent at 4:12-14.) Figures 3 and 8 show "PFC Boost 44" as part of and within the "power circuit 47." ('446 patent at FIGS. 3, 8.) The specifications of the mate patents refer to the "power factor correction (PFC) boost" as "power factor correction (PFC) boost 44," and "PFC boost 44." A POSA would understand "power factor correction (PFC) boost" to refer to a portion of the circuitry of the power circuit that increases (i.e., boosts) the power factor. The power factor is the ratio of actual power to apparent power. (MDE (definition of "power factor").) This is commonly referred to as power factor "correction" because a lower power factor results in an increase of wasted power. (MDE (definition of "power factor correction").)

26.    Based on the intrinsic evidence, a POSA would understand the term "power factor correction (PFC) boost" in the asserted claims of the mate patents is a power factor correction boost circuit and apply that plain and ordinary meaning. To the extent, the plain and ordinary meaning of "power factor correction boost" requires further explanation, it is "a circuit that increases the power factor." The extrinsic evidence, including the definition of "power factor" and "power factor correction" in the MDE, is consistent with and supportive of mate's construction.

27.     EL's proposed construction of "power factor correction boost" as "a setting that adjusts the ratio of energy a device transmits to the output versus the total amount of energy it receives from the input power source" is incorrect. As an initial matter, "the ratio of energy a device transmits to the output versus the total amount of energy it receives" is a measure of efficiency, not power factor. Power factor is the ratio of actual power to apparent power. (MDE (definition of "power factor").) Furthermore, there is nothing in the mate patents describing power factor correction boost as being a setting. Also, because the claims describe the "power factor correction boost" as a component of the "power circuit" and as "connected to the inrush current limit and the DC/DC converter," a POSA would understand "power factor correction boost" to be a circuit that increases the power factor and not a setting.

28.     Further, I understand that EL asserts that "power factor correction (PFC) boost" is indefinite. I disagree. As discussed above, it is my opinion that a POSA would understand the plain and ordinary meaning of "power factor correction (PFC) boost." Thus, the claim term "power factor correction (PFC) boost," read in light of the intrinsic evidence, does not fail to inform a POSA, with reasonable certainty, about the scope of the claimed invention and is not indefinite.

### D.     Connected

29.     I have reviewed both parties' proposed constructions of "connected" and related evidence. Based on the intrinsic and extrinsic evidence, I agree with mate's proposed construction of "connected" as having its plain and ordinary meaning, which is "joined directory or indirectly."

30.     The mate patents use the term connected to describe direct and indirect connections of components. When the mate patents sought to narrowly describe a direct connection, they say so. The mate patents simply use "connected" to convey a connection between components that has intervening components. For example, the mate patents state that "[t]he primary digital controller 58 is further connected, via an isolated communication bus 61 to a secondary digital controller 64." ('446 patent at 4:26-29.)

8

Moreover, FIGS. 3 and 8 show an "isolation barrier[] 80" between the "connected" primary digital controller and the secondary digital controller. These statements in the specification make clear that the primary digital controller 58 and the secondary digital controller 64 are separated by an intervening isolated communication bus 61 and isolation barrier 80, but are still simply described as being "connected." The mate patents also describe connections with no intervening components simply as connected. For example, the '446 patent states that the "converter 46 is connected to an Output Voltage bus 48 which is connected to a power limiter." ('446 patent at 4:10-11.) In contrast, when the '446 patent limits the description of the components to only direct connection, it says so. With regard to a description of a disclosed embodiment, the patent states that "[a]n EMI filter 82 is connected between the power supply and the current limit and is **_connected directly_** to the PFC boost." ('446 patent at 5:13-15 (emphasis added).)

31.     Thus, a POSA would understand the claim term "connected" to include direct and indirect joining unless explicitly stated otherwise. The extrinsic evidence is also consistent with mate's construction. For example, MDE defines "connection" as "attachment of two or more component parts so that conduction can take place between them." (MDE (definition of "connection").) Two or more components do not need to be directly connected (i.e., no intervening components) for conduction to take place between them. This is shown by the primary and secondary digital controllers discussed above.

32.     EL's proposed construction of "connected" as "directly joined" is incorrect. There is nothing in the mate patents that would limit "connected" to only a direct connection. EL's proposed construction improperly narrows the term contrary to the ordinary meaning of the term in light of the intrinsic and extrinsic evidence.

### E.     Apparatus for power factor correction and DC/DC conversion

33.     I have reviewed both parties' proposed constructions of "apparatus for power factor correction and DC/DC conversion" and related evidence. Based on the intrinsic and extrinsic evidence, I agree with mate's proposed construction of "apparatus for power factor correction and DC/DC conversion" as a means plus function claim

9

having a corresponding structure of power factor correction circuit and a DC/DC converter circuit and equivalent structures and a recited function of power factor correction and DC/DC conversion. The extrinsic evidence is also consistent with and supportive of mate's proposal.

34.     I understand that a claim limitation should be construed as means plus function when the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function. The claim at issue recites "apparatus for power factor correction and DC/DC conversion." The phrase recites the functions of "power factor correction and DC/DC conversion" but does not recite sufficient structure for performing those functions. Nothing else in the claim recites sufficient structure for performing those functions. Instead, the claim merely recites that the functions are performed by an "apparatus." A POSA would not recognize the term "apparatus" as having a sufficiently definite meaning for the name of a structure. In the claim at issue, "apparatus" is merely a nonstructural generic placeholder for performing the claimed function. Therefore, "apparatus for power factor correction and DC/DC conversion" is a means plus function claim limitation.

35.     "Power factor correction" refers to increasing the power factor (i.e., the ratio of actual power to apparent power). (MDE (definition of "power factor").) A POSA would understand that "correction" of the power factor means to increase the power factor to be closer to 100%. (MDE (definition of "power factor correction").) DC/DC conversion is the function of receiving DC power through a DC input at a first voltage level and converting that power to a different voltage level at a DC output.

36.     As stated above, a POSA would understand that the corresponding structure in the '310 patent for performing the claimed functions is a power factor correction circuit and a DC/DC converter circuit. The dependent claims support this construction. For example, claim 16 which is dependent on claim 1 states that the "apparatus for power factor correction and DC/DC conversion comprises a DC/DC converter[] and a power factor correction (PFC) boost . . . ." The '310 patent specification states that the "inrush

circuit 40, the PFC boost 44, the DC/DC converter 46, the Output Voltage Base bus 48 and the power limit 50 can be seen as a power circuit 47." ('310 patent at 4:18-20.) Furthermore, Figures 3 and 8 show a PFC boost circuit for power factor correction and a DC/DC converter circuit for DC/DC conversion.

37.    EL's proposed construction of "apparatus for power factor correction and DC/DC conversion" as "device that adjusts the ratio of energy a device transmits to the output versus the total amount of energy it receives from the input power source and converts direct current from one voltage setting to another voltage setting" and not a means plus function claim is incorrect because the claim should be construed as means plus function for the reasons stated above and because "the ratio of energy a device transmits to the output versus the total amount of energy it receives" is a measure of efficiency, not power factor, as stated above.

### F.    An apparatus for mapping the set of output current drivers to various dimming zones and for mapping output channels into groups

38.    I have reviewed both parties' proposed constructions of "apparatus for mapping the set of output current drivers to various dimming zones and for mapping output channels into groups" and related evidence. Based on the intrinsic and extrinsic evidence, I agree with mate's proposed construction of this term as a means plus function claim having corresponding structure of a port and a controller and equivalent structures and a recited function of mapping the set of output current drivers to various dimming zones and for mapping output channels into groups.

39.    I understand that a claim limitation should be construed as means plus function when the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function. The claim at issue recites "apparatus for mapping the set of output current drivers to various dimming zones and for mapping output channels into groups." The phrase recites the functions of "mapping the set of output current drivers to various dimming zones and for mapping output channels into groups" but does not recite sufficient structure for performing those

functions. Nothing else in the claim recites sufficient structure for performing those functions. Instead, the claim merely recites that the functions are performed by an "apparatus." A POSA would not recognize the term "apparatus" as having a sufficiently definite meaning for the name of a structure. In the claim at issue, "apparatus" is merely a nonstructural generic placeholder for performing the claimed function. Therefore, "apparatus for mapping the set of output current drivers to various dimming zones and for mapping output channels into groups" is a means plus function claim limitation.

40.    As stated above, a POSA would understand that the corresponding structure in the '310 patent for performing the claimed functions is a port and controller. The specification and drawings of embodiments describe a secondary digital controller 64 and an ICSP port 68 as performing the claimed functions. ('310 patent at 9:63-10:19.) An ICSP port is short for an in-circuit serial programming port. A POSA would understand that an ICSP port allows a controller connected to the ICSP port to be programmed through the port even after the device has been built into the configurable LED driver. The specification states that "[i]n DMX512A applications, the ICSP port 68 also allows for the mapping of each of the output channels to a wide variety of addresses." ('310 patent at 9:65-67.) Therefore, DMX addresses can be programmed through the ICSP port for each output channel. Programming a DMX address for each output channel maps them to various dimming zones, as each DMX address is a dimming zone. It also maps the output channels into groups, as output channels assigned to the same DMX address form a group. The '310 patent provides an example where the first six channels form a first group assigned to dimming zone DMX01 and the last six channels form a second group assigned to dimming zone DMX02. ('310 patent 10:4-11.)

41.    EL's proposed construction of "apparatus for mapping the set of output current drivers to various dimming zones and for mapping output channels into groups" as "a device designed to assign a number of output current drivers to various dimming zones and for assigning output channels into groups" and not as a means plus function

1  claim is incorrect because the claim should be construed as means plus function for the

2  reasons stated above.

3      **G.    Break-out module**

4      42.    I have reviewed both parties' proposed constructions of "break-out module"

5  and related evidence. Based on the intrinsic and extrinsic evidence, I agree with mate's

6  proposed construction of "break-out module" as having its plain and ordinary meaning.

7  The disclosure of "break-out module" in the '601 patent is consistent with the plain and

8  ordinary meaning of the term. The extrinsic evidence is also consistent with and

9  supportive of mate's proposal.

10     43.    The '601 patent provides a diagram of an implementation of a break-out

11 module 51 in FIG. 13. The patent specification states that "[t]he break out module 51

12 comprises two printed circuit board (PCB) assemblies 420 with modular power

13 connectors 422 arranged as terminal blocks to provide an electrical connection between

14 the feed in channels and the feed out channels which are seen as cabling 204." ('601

15 patent at 12:25-30.) A schematic representation of a break-out module 51 is shown in

16 FIG. 13b. Claim 1 of '601 recites that the break-out module is "electrically connected to

17 an output of the LED driver and the set of light fixture loads." It further recites that the

18 break-out module includes "power connectors" and that "the break-out module receives

19 power from the LED driver via a set of input channels and delivers power to the set of

20 light fixture loads via a set of output channels." Dependent claims further specify

21 limitations for the break-out module applicable to those claims. For example, claim 6

22 provides that the break-out module has a printed circuit board. Thus, the claims define the

23 structural and operational characteristics of the break-out module. The specification

24 provides a non-limiting example of a break-out module that is consistent with the claims.

25 Thus, a POSA would understand that the '601 patent uses the claim term "break-out

26 module" as a name for a component having the claimed features.

27     44.    EL's proposed construction of "break-out module" as "a separate assembly

28 of components that can be added, removed or replaced in a larger system" is incorrect

because adds unnecessary, undisclosed and unclaimed requirements to the "break-out module." Indeed, there is nothing in the intrinsic evidence that supports EL's proposal that break-out must be "a component that can be added, removed or replaced in a larger system." While the plain and ordinary meaning does not preclude such features for the break-out module, it does not require or claim them.

### H. Limiting converted power

45.    I have reviewed both parties' proposed constructions of "limiting converted power" and related evidence. Based on the intrinsic and extrinsic evidence, I agree with mate's proposed construction of "limiting converted power" as having its plain and ordinary meaning. The disclosure of the '093 patent is consistent with and supportive of the plain and ordinary meaning of the term. (*See, e.g.*, '093 patent at Abstract, 4:34-53; 5:4-13, 6:25-35, 10:11-19, 10:61-11:19, 13:57-67, FIGS. 1-19, Claim 11.)

46.    Claim 11 of the '093 patent is method claim. One of the limitations is "limiting converted power to multiple current outputs supplied to the set of light fixture loads." In the context of the entire claim, AC power input to the device is converted to DC power. That converted DC power is supplied the set of light fixtures, but is limited and cannot exceed a maximum value. Thus, it is clear from the claim itself that "limiting converted power" is simply the step of limiting the power that is supplied to the light fixture loads through the multiple current outputs to a maximum value. Limiting the power is often done for safety reasons.

47.    EL's proposed construction of "limiting converted power" as "a setting that equals the maximum amount of power produced by a device" is incorrect. There is nothing in the mate patents that describes limiting converted power as being a setting. Furthermore, as explained above, "limiting converted power" is a step in a method claim. EL has incorrectly construed "limiting converted power" to be structural, not a method step.

**I.     Apparatus for configuring the set of output current drivers to an output current set point**

48.     I have reviewed both parties' proposed constructions of "apparatus for configuring the set of output current drivers to an output current set point" and related evidence. Based on the intrinsic and extrinsic evidence, I agree with mate's proposed construction of "apparatus for configuring the set of output current drivers to an output current set point" as a means plus function claim having a corresponding structure of port and controller and equivalent structures and a recited function of configuring the set of output current drivers to an output current set point, i.e., the set point of the output current / programmed peak output current. The disclosure of this term in the '759 patent is consistent with mate's proposal. The extrinsic evidence is also consistent with and supportive of mate's proposal.

49.     I understand that a claim limitation should be construed as means plus function when the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function. The claim at issue recites "apparatus for configuring the set of output current drivers to an output current set point." The phrase includes the function of "configuring the set of output current drivers to an output current set point," but does not recite sufficient structure for performing that function. Nothing else in the claim recites sufficient structure for performing that function. Instead, the claim merely recites that the functions are performed by an "apparatus." A POSA would not recognize the term "apparatus" as having a sufficiently definite meaning for the name of a structure. In the claim at issue, "apparatus" is merely a nonstructural generic placeholder for performing the claimed function. Therefore, "apparatus for configuring the set of output current drivers to an output current set point" is a means plus function claim limitation.

50.     As stated above, a POSA would understand that the corresponding structure in the '759 patent for performing the claimed functions is a port and controller. The specification provides that the "output current set point is programmed via the ICSP port

15

54" and that the ICSP port "provides access to the load controller 90 such that firmware updates are possible to permit the configuration of the output current drivers 52." ('759 patent 6:60-64, 7:14-19.) A POSA would understand that the ICSP port allows a controller connected to the ICSP port to configure the set of output current drivers to an output current set point. While the term "output current set point" would be understood by a POSA, the specification explains that the output current set point is the programmed peak output current. ('759 patent at 7:14-23.)

51.   EL's proposed construction of "apparatus for configuring the set of output current drivers to an output current set point" as "a device designed to provide the maximum current capable of being outputted by a number of output current drivers" and not as a means plus function claim is incorrect because the claim should be construed as means plus function for the reasons stated above. Also, the function recited by the claim is "configuring the output current drivers …," not "to provide the maximum current …" as stated in EL's proposed construction. Thus, EL's proposed construction is inconsistent with the language of the claim and is incorrect.

## J.   Current sense

52.   I have reviewed both parties' proposed constructions of "current sense" and related evidence. Based on the intrinsic and extrinsic evidence, I agree with mate's proposed construction of "current sense" as having its plain and ordinary meaning, which is a "circuit that senses current."

53.   The claims of the '310 patent describe a "current sense" as a component of "each of the set of output current drivers." ('310 patent at claim 19.) Figures 6 and 7 show "current sense 94" and "current sense 116," respectively. ('310 patent at FIGS. 6,7.) The specification of the '310 patent refers to the "current sense" as "current sense 94" and "current sense 116." (*See, e.g.*, '310 patent at 6:33-36, 6:50-62, 7:29-50.) The mate patents explain that "current sense 94" "provides a digital feedback loop for each current source 92." ('310 patent at 6:50-62.) It would be clear to a POSA that the current sense is

a circuit that senses current and may be used to provide feedback to the load controller for the current source.

54.     Based on the intrinsic evidence, a POSA would understand the term "current sense" in the claims of the '310 patent and apply its plain and ordinary meaning, which is a "circuit that senses current." (*See, e.g.*, '310 patent at 6:33-36, 6:50-62, 7:29-50, FIGS. 6, 7, claim19.)

55.     EL's proposed construction of "current sense" as "a setting that detects electrical current" is incorrect. There is nothing in the mate patents that describes "current sense" as being a setting. Also, it would not make sense to a POSA that a "setting" could sense or detect electrical current as EL proposes. Also, because the claims describe the "current sense" as a component of the "each of the set of output current drivers," a POSA would understand "current sense" to be a circuit that senses current and not a setting.

## VI.   CONCLUSION

56.     The above summaries of my opinions on claim construction are based on the information made available to me to date. I reserve the right to state these opinions more fully in connection with mate's claim construction briefing and to supplement or amend the opinions to the extent additional information becomes available to me. I also reserve the right to respond to any arguments made by EL in its claim construction briefing.


Dated: July 28, 2023                    /Bruce A. Young/

                                        Bruce A. Young

# Appendix A

# Bruce A. Young

12205 NW 85th Ave, Grimes, IA 50111
bruce@youngtogether.com
https://www.linkedin.com/in/bruceayoung/
712-541-9822

## PROFILE

Registered Patent Agent with experience drafting and/or prosecuting hundreds of patent applications, including US Utility, US Design, and PCT applications. Proficient at integrating Intellectual Property strategy into the business including developing and implementing processes for mining the product development process for IP. Inventor on over 50 issued US patents covering a broad range of technologies and co-author of the original PCI Bus Specification. Accomplished patent analyst and subject-matter expert for patent litigation related to computers. Skilled at creating claim charts and analyzing products for potential infringement. Adept at creating and executing corporate patent strategies. Experienced at supporting counsel on a variety of IP, litigation, and licensing issues.

## PROFESSIONAL EXPERIENCE

**Young's Patent Services, LLC** — **Full Time Patent Agent** 2010-2021 and 2022-Present
**– Part time** 2000-2010

Grimes, IA 50111

**Patent Services:** In solo practice providing patent drafting, prosecution and searching services, as well as consulting on intellectual property issues, for multiple clients. Extensive experience with US utility, provisional and design applications, as well as PCT applications. Specializing in electronic and computer arts but also drafted applications for semiconductor, internet, mechanical, software and green technology. Consulting for clients to analyze patents and evaluate IP portfolios. Consulted on several lawsuits as a content expert and briefed the judge at a Markman hearing in one case. Also acted as a technical expert in an inter-parties review (IPR), drafting expert opinions and providing expert testimony in depositions.

**PCT Learning Center** — **PCT Guest Lecturer** 2021-Present
Leesburg, VA [www.pctlearningcenter.org]

**Guest Lecturer:** Provide PCT training to patent attorneys and other patent professionals.

**Haynes, Beffel, & Wolfeld, LLP – Senior Patent Agent** 2021-2022
Half Moon Bay, CA 94019 [www.hmbay.com]

**Patent Preparation and Prosecution:** Work with client companies and their employees to identify patentable inventions through IP mining sessions and invention disclosure meetings. Prepare US and PCT patent applications for filing. Respond to Office Actions and help manage patent portfolios through selective filing of Divisional and Continuation Applications. Focus on Artificial Intelligence and Machine Learning systems.

**Jabil Circuit, Inc.** — **Director of System Architecture for Display Technology**
St. Petersburg, FL 33716 [www.jabil.com]

**LCD TV Development:** Global responsibility for technical aspects of Jabil's LCD TV business including technology and platform roadmaps. Managed a global team of system architects and closely coordinated with development teams worldwide. In-depth interactions with customers world-wide to understand their requirements and ensure those requirements were met with Jabil's roadmap. This position involved 75% travel, mostly international.

## PROFESSIONAL EXPERIENCE (Continued)

### Radiosophy, LLC — Chief Technology Officer
North Sioux City, SD (no longer in business)

**HD Radio Receiver:** Second in command at small 13 person start-up creating a low-cost HD Radio receiver. Responsible for all technical activities at the company. Led creation of 100+ page business plan. Created IP strategy then drafted and filed several patent applications.

### Digital 5, Inc. — Chief Technology Officer
Lawrenceville, NJ (no longer in business)

**Network Media Streaming:** Responsible for all technical aspects of the company's business of creating DLNA software/middleware for media streaming. Managed an organization of 60 people in multiple worldwide. Created and managed IP strategy. Drafted and filed patent applications.

### Gateway, Inc. — Director, Sr. Manager, Chief Engineer
North Sioux City, SD (now a part of Acer Inc.) [www.gateway.com]

**Advanced Engineering:** Managed the Intellectual Property group and a group of chief engineers. Developed Gateway's patent portfolio and IP licensing strategy. Supported Gateway legal department for IP litigation technology issues. Evaluated and productized new technologies.

**PCs and Consumer Electronics:** Technology Lead for Gateway's *Destination* pioneering the PC/TV category. Created technical roadmaps and managed teams for various PC components as CE products including HD LCD TVs. Twice elected to industry PCI SIG Steering Committee.

### Intel Corporation — Sr. Staff Engineer, Staff Engineer
Intel Architecture Labs, Hillsboro, OR [www.intel.com]

**PC Platform Architecture:** Specified next generation PC architectures emphasizing improved I/O subsystems for the PC to enable new applications. Co-Architect of Mercury/Neptune and Mars PCI chipsets. Inventor on key patents central to modern chipset design.

**PCI:** Co-developer of protocol for the Peripheral Component Interconnect (PCI) local bus. Author of *PCI System Design Guide* and initiated process of patenting key elements of PCI. Chair of PCI SIG Power Management WG and primary author of *PCI Power Management Specification*.

### Aptec Computer Systems—Senior Design Engineer
Beaverton, OR (no longer in business)

### Pixar Animation Studios (formerly Lucasfilm Computer Division, now owned by Disney) — Consultant, Project Manager, Sr. Design Engineer
San Rafael (now Emeryville), California (www.pixar.com)

### Hewlett-Packard—Member of Technical Staff, Co-Op Student
Fort Collins Systems Division, Fort Collins, CO (www.hp.com)

## EDUCATION AND OTHER INFORMATION

**Master of Science** in Electrical Engineering, Stanford University, Palo Alto, CA
**Bachelor of Science** in Computer Engineering, Iowa State University, Ames, IA
**Registered Patent Agent**, Registered to practice before the USPTO in 2000, Registration #45656
National Association of Patent Practitioners (NAPP), Board Member 2015-2017
Active ongoing participation in CLE activities including many Webinars and NAPP Annual Meetings
PLI Fundamentals of Patent Prosecution: A Boot Camp for Claim Drafting & Amendment Writing
PLI Advanced Patent Prosecution Workshop: Claim Drafting and Amendment Writing
Comprehensive & Advanced Patent Cooperation Treaty (PCT) Seminars by the PCT Learning Center
Inventor on over 50 issued and several pending US patents as well many foreign counterparts
Jabil Global Leadership Forum at Harvard Business School, Gateway & Intel Management Training
Earned rank of Eagle Scout as a youth